# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00443-CV

**Johnette Raye McConnell Early, Individually and as Independent Executrix of the Estate of John Posey McConnell, Jr., Deceased, and as Trustee of the Testamentary Trust Created by the Last Will and Testament of John Posey McConnell, Jr.; and Patsy Raye McConnell, Appellants**

v.

**James Turner Cameron, Independent Executor of the Estate of Sara Jean Cameron, Deceased, and as Co-Trustee of the Sara Jean Cameron Testamentary Trust; Patricia Sue Cameron Shaw, Co-Trustee of the Sara Jean Cameron Testamentary Trust; and Linda Jean Cameron Sloan, Co-Trustee of the Sara Jean Cameron Testamentary Trust, Appellees**

### FROM THE 33RD DISTRICT COURT OF SAN SABA COUNTY
### NO. 9393, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Johnette Raye McConnell Early, Individually and as Independent Executrix of the Estate of John Posey McConnell, Jr., Deceased, and as Trustee of the Testamentary Trust Created by the Last Will and Testament of John Posey McConnell, Jr.; and Patsy Ray McConnell appeal from the trial court's Modified Declaratory Judgment Regarding Easement. Following a bench trial, the trial court declared an easement by necessity across appellants' land and awarded attorney's fees against appellants. For the following reasons, we reverse the award of appellate attorney's fees and remand that issue to the trial court for redetermination and affirm the remainder of the trial court's declaratory judgment.

## BACKGROUND

Mattie R. Turner, who was married to Rufus Turner, owned the land that is at the center of the parties' dispute until April 1, 1914, when she deeded the southern portion of her land (Joe's Tract) to her son Joe Turner. Joe Turner was the grandfather of appellees Linda Jean Cameron Sloan, Patricia Sue Cameron Shaw, and James Turner Cameron.

At the time of severance in 1914, Joe's Tract was approximately 167 acres and landlocked. It was bounded by Mattie Turner's remaining land to the north and east, by the San Saba River to the south, and by a tract of land that had been deeded to Temperence Ketchum in 1871 to the west. According to appellees, after Mattie Turner deeded Joe's Tract in 1914, it was accessed by a roadway ("the Roadway") that crossed over Mattie Turner's remaining land to "County Road 202 (China Creek Road)," as pictured by the blue line on the below exhibit:



The exhibit also depicts an express access easement, as pictured by the red line, and the tracts of land that Mattie Turner later deeded to her daughters Beatrice Turner and Floss McConnell. In 1923, Mattie Turner deeded 200 acres to the north of Joe's Tract to Floss McConnell, the grandmother of appellant Johnette Early; and in 1928, she deeded 153 acres to the east and northeast of Joe's Tract to Beatrice Turner.

Mattie Turner died in 1934, and after Rufus Turner died in 1947, Joe Turner and his sisters partitioned additional land that they inherited from their mother and executed deeds on the tracts that their mother had previously deeded to them. Joe Turner continued to own Joe's Tract, and it remained landlocked, but it increased in size by approximately 7.6 acres.

As to the express easement depicted on the above exhibit, by 1984, Joe's Tract was owned by his daughters Sara Jean Cameron and Betty Jo Miller. At that time, they partitioned the tract to create two tracts: a tract to the west and a tract to the east, and the deed for the western tract included an express easement across the northern boundary of the eastern tract. Johnette Early now owns the eastern tract, and the western tract is owned by appellees (Plaintiffs' Tract), as pictured here:



Around 2013, Johnette Early sought to limit access from Plaintiffs' Tract across appellants' tracts, including locking the gate from the Roadway.[1]  In response, James Turner Cameron, Independent Executor of the Estate of Sara Jean Cameron, Deceased, and as Co-Trustee of the Sara Jean Cameron Testamentary Trust; Patricia Sue Cameron Shaw, Co-Trustee of the Sara Jean Cameron Testamentary Trust; and Linda Jean Cameron Sloan, Co-Trustee of the Sara Jean Cameron Testamentary Trust (plaintiffs) filed a petition for declaratory relief and application for temporary and permanent injunctions.[2]  The parties entered

---

[1]  At trial, Jeff Sloan, whose mother is Linda Sloan, testified that before 2013, no one told plaintiffs that they could not drive on the Roadway, that he had not had any trouble, and that they had a key to the locked gate that provided access to the Roadway "for decades," but that "[s]everal years ago [appellants] cut all the locks off and put a new chain on there."

[2]  *See generally* Tex. Civ. Prac. & Rem. Code §§ 37.001-.011 (Uniform Declaratory Judgments Act).

into a rule 11 agreement for temporary orders that appellants "would not interfere with Plaintiffs' use of the roadway in question," and the trial court signed an agreed temporary injunction that ordered appellants not to interfere with "Plaintiffs' use of the easement and road" or to lock any gate across the easement without furnishing a key or combination to a lock to give plaintiffs access to the easement. The trial court also authorized plaintiffs to employ a surveyor to prepare a legal description of the easement.

A two-day bench trial occurred in February 2024. The county surveyor who surveyed and prepared a legal description of the Roadway, various family members, the current owner of the tract of land to the west of Plaintiffs' Tract, and attorneys testified. The evidence was undisputed that Plaintiffs' Tract was landlocked, but the parties presented conflicting evidence concerning the necessity of an easement across appellants' tracts to access Plaintiffs' Tract from 1914 to the time of trial.

According to appellants, Plaintiffs' Tract was and continued to be accessed from land on the south side of the San Saba River and from land to the west of the tract. Ricky Lambert, who was the current owner of the land to the west, confirmed that no easement existed across his land to Plaintiffs' Tract but testified that he had allowed access to Plaintiffs' Tract through his land when asked. As to the land on the south side of the San Saba River, Sloan Livestock Limited (Sloan Livestock) owned this land. Jeff Sloan, the son of Linda and Bill Sloan, testified that he, his brother, and their father were the owners of Sloan Livestock and that it was "a livestock company that's predominantly cow and calf operation in San Saba." Sloan Livestock leased Plaintiffs' Tract and used it in its ranching operation. There was no express easement across the property owned by Sloan Livestock that authorized access between

6

Plaintiffs' Tract and a public road. There also was no bridge across the San Saba River between the properties, but the riverbed was crossable when conditions were right.

Plaintiffs presented evidence that from the time of severance in 1914, the only legal access to Plaintiffs' Tract had been and continued to be by traveling across appellants' tracts to China Creek Road. The evidence was that after Mattie Turner deeded Joe's Tract, he continued to use the tract of land for farming and ranching in combination with his mother's remaining land and then with his sisters' land. James Cameron, who was the son of Sara Cameron and born in 1954, testified that Rufus Turner farmed and ranch the land "as soon as they got there," that he continued to farm and ranch the land as a unit with his son Joe Turner,[3] and that they made improvements to Joe's Tract "in order to have been irrigating the crops in 1921." He testified about an "aboveground flume line, which is how they irrigated the upper parts of the field" that he remembered as a "little child."

According to "family lore and reputation," the Turners' first house was down by the river, but after flooding, they built and moved to the house that still stands and is located on China Creek Road. In her deposition, Betty Jo Miller,[4] who was born in 1921 in the house on China Creek Road and lived there until 1943, testified that her father Joe Turner grew cotton,

---

[3] James Cameron testified that when Rufus Turner was involved, he and his son "ran everything together" and as to the Roadway:

> [E]veryone in my family, meaning my mother, my aunt, that was the way they all went to the riverbottom [Joe's Tract]. That's the only road to get there. And my mother told me from my youngest memories that that was how Pop Turner and Nanny Joe got to the riverbottom [Joe's Tract] and worked the land was that they would ride them down the road and then they'd turn around and ride back to the house.

[4] Betty Jo Miller died during the pendency of the lawsuit.

corn, and maize on Joe's Tract; that from her earliest memories, people who were living on Joe's Tract accessed it by the Roadway from China Creek Road;[5] that she had personally used the Roadway "[a]ll of [her] life";[6] and that she never had any other easement or legal right to go another way.[7]

Jeff Sloan, who was born in 1962, testified about using the Roadway from his "earliest memories" until the time of trial. He testified that the Roadway was used to convey tractors, plows, and grain trucks for farming operations on Plaintiffs' Tract and that he had put a "swinging gate" in the middle of the Roadway because the "old fence . . . was falling down."[8] Bill Sloan, who started using the Roadway in the 1960s, testified about improvements that Sloan Livestock had made to Plaintiffs' Tract that they would not have been able to do without use of

---

[5] No one was living on Plaintiffs' Tract at the time of trial, and the evidence was not clear when the last person resided there, but it was sometime after 1950.

[6] When asked the means that she employed to travel the Roadway, Betty Jo Miller answered that they "walked down there" when they "were kids" and "then rode horseback down there, and in the car," and she testified that they "always traveled that road." She also remembered riding on cotton wagons from Joe's Tract on the Roadway to the cotton gin in town.

[7] In her deposition, Betty Jo Miller testified:

Q.    You never had any other easement or legal right to go through anywhere else?
A.    No.
Q.    Is this the only—the road in question, the only road you claim to have a legal right to travel to get down there?
A.    Exactly.
Q.    All right, and if it weren't for the road in question, would [Plaintiffs' Tract] be landlocked to its current owners?
A.    Yes.

[8] The equipment included a water well drilling rig, bulldozer, tree shapers, and pecan pickers. Bill Sloan testified that it was necessary to convey the equipment by the Roadway to Joe's Tract and that among the uses of the equipment was to drill a well to feed cattle and to harvest pecans on Joe's Tract.

8

the Roadway. Patricia Sue Shaw, who was born in 1946, testified that the Roadway had been in the same location from her earliest memories, that she traveled the Roadway on many occasions, that family used the Roadway to access Plaintiffs' Tract, and that no one said that they could not use the Roadway.

The evidence also showed that when Rufus Turner died around 1947, the siblings signed deeds that redivided their tracts, that Joe's Tract slightly increased in size, but that Joe Turner continued to own the tract and that it continued to be accessed by the Roadway.[9] The exhibits included a 1947 survey of the repartitioned tracts between the siblings, various deeds showing chains of title for the tracts of land, photographs, maps, the survey of the Roadway, commissioners' court minutes from the late 1800s concerning China Creek Road, and the transcript of Betty Jo Miller's deposition.

Following the bench trial, the trial court signed the Modified Declaratory Judgment Regarding Easement. The trial court declared that plaintiffs had an "easement by necessity for the free and uninterrupted passage, except as otherwise provided in the judgment, to and from the Dominant Estate, along the centerline described in Exhibit A, which is attached hereto and made a part hereof by reference (the "Necessity Easement")."[10] Exhibit A was the survey of the Roadway across appellants' properties to China Creek Road. The trial court described appellants' tracts as Servient Estates 1, 2, and 3, and Plaintiffs' Tract as the Dominant Estate, and found:

---

[9] Betty Jo Miller answered "Yes," when asked if the Roadway was being used in 1947 when the deeds were executed between the siblings and testified that it had been continuously used after that.

[10] The trial court also found that plaintiffs had established the elements of their alternative theory of easement by estoppel, but that it "cannot arise when an easement by necessity already exists and provides the same access as the easement by estoppel would afford."

The Court finds that Plaintiffs and their predecessors in title have had an easement by necessity to travel over the lands now described as Servient Estate 1 and Servient Estate 2, since April 1, 1914, when Mattie R. Turner deeded substantially all the Dominant Estate to Joe C. Turner; that immediately before the execution of such deed, Mattie R. Turner owned the Dominant Estate, Servient Estate 1, Servient Estate 2 and Servient Estate 3; that at the time of the 1914 deed to Joe C. Turner, the only legal access to the land described in the deed was by necessity over and across the remaining land of Mattie R. Turner to the public road known at different times as the Brownwood Road via Beverage Crossing, Brownwood Road No. 2, China Creek Road and San Saba County Road 202; that such road was a public road on April 1, 1914 and has existed as a public road from before 1914 to the present date; and that a necessity for the easement across Servient Estate 1 and Servient Estate 2 has continued from April 1, 1914 to the present time.

The Court also found that Servient Estate 3 was burdened with an access easement, described the scope of the easement by necessity across the servient estates, and awarded attorney's fees to plaintiffs. The court awarded $69,424.11 for fees incurred through the trial court level, $80,000 if the case was appealed to the Court of Appeals, $30,000 if a petition for review was filed in the Texas Supreme Court, $40,000 if briefing on the merits was requested by the Texas Supreme Court, and $15,000 if oral argument was held in the Texas Supreme Court.

The trial court addressed the bases for its judgment more fully in findings of fact and conclusions of law, including the following:

**Findings of Fact**

\*\*\*

3.      The Dominant Estate belonging to Plaintiffs is a tract of land in San Saba County, Texas, containing 123.93 acres of land, more or less, described as Parcel Two of Tract One in a partition deed between Sara Jean Cameron and Betty Jo Miller, dated September 14, 1984, recorded in Vol. 184, Page 463 of the Deed Records of San Saba County, Texas.

4.      The Defendants, collectively, own three tracts of land over which Plaintiffs must travel to reach the Dominant Estate. The three tracts of land are found to be Servient Estates and are described as follows: [describing Servient Estates 1, 2, and 3].

5.      Plaintiffs and their predecessors in title have had an easement by necessity to travel over the lands now described as Servient Estate 1 and Servient Estate 2, since April 1, 1914, when Mattie R. Turner deeded substantially all the Dominant Estate to Joe C. Turner (the "Necessity Easement").

6.      Immediately before the execution of the deed to Joe C. Turner on April 1, 1914, Mattie R. Turner owned the Dominant Estate, Servient Estate 1, Servient Estate 2, and Servient Estate 3.

7.      At the time of the 1914 deed to Joe C. Turner, the only legal access to the land described in the deed was by necessity over and across the remaining land of Mattie R. Turner to the public road known at different times as the Brownwood Road via Beverage Crossing, Brownwood Road No. 2, China Creek Road and San Saba County Road 202.

8.      China Creek Road was a public road on April 1, 1914 and has existed as a public road from before 1914 to the present date.

9.      The center line of the Necessity Easement is described on Exhibit A attached to the Modified Declaratory Judgment Regarding Easement that has been entered in this cause.

10.     Servient Estate 3 is burdened with an access easement . . . (the "Deeded Easement"). The Deeded Easement was created in the partition deed between Sara Jean Cameron and Betty Jo Miller, dated September 14, 1984, . . . and is now owned by Plaintiffs.

11.     Except for the south 20 feet of the Necessity Easement, the easement needs to be 30 feet wide, which is a standard width for easements of this type in San Saba County, Texas, and will allow for vehicles and farm equipment traveling in opposite directions to pass each other while staying within the easement's boundaries.

12.     To allow for trucks, trailers and farm equipment to turn to and from the

11

Necessity Easement and the Deeded Easement, the south 20 feet of the Necessity Easement needs to be 38 feet wide, with 15 feet of such width being on the east side of the centerline and 23 feet on the west side of the centerline.

13.     A necessity for the easement across Servient Estate 1 and Servient Estate 2 has continued from April 1, 1914 to the present time and without such easement by necessity the Dominant Estate would be landlocked.

\*\*\*

**Conclusions of Law**

\*\*\*

5.      An easement by necessity exists to allow Plaintiffs access over and across Servient Estate 1 and Servient Estate 2 to connect with the Deeded Easement across Servient Estate 3, which then provides access from the Dominant Estate to a public road.

Appellants requested additional findings of fact and conclusions of law, but the trial court did not issue further findings or conclusions. This appeal followed.

## ANALYSIS

Appellants bring two issues on appeal. In their first issue with five sub-issues, they challenge the legal and factual sufficiency of the evidence to support the trial court's findings and conclusions of an easement by necessity and the award of attorney's fees. In their second issue, Appellants argue that the evidence conclusively established that "a merger of estates in 1947 eliminated any claim of a pre-existing easement by necessity and that any statute of frauds defense was waived (or otherwise inapplicable due to estoppel or other pleaded defenses)."

12

**Standard of Review**

In an appeal from a bench trial, we subject the trial court's findings of fact to the same standards of review applied to jury verdicts. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *see also Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991) (explaining that trial court's findings of fact have "same force and dignity as a jury's verdict upon questions"); *Trinity Drywall Sys., LLC v. TOKA Gen. Contractors, Ltd.*, 416 S.W.3d 201, 206-07 (Tex. App.—El Paso 2013, pet. denied) ("Declaratory judgments are reviewed under the same standards as other judgments." (citing Tex. Civ. Prac. & Rem. Code § 37.010)). We "defer to the trial court's findings of fact—so long as they are supported by the record—and review conclusions of law de novo." *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020). We will uphold the trial court's conclusions if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

When there is a reporter's record of the bench trial, the trial court's findings are reviewable for legal and factual sufficiency of the evidence. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *12636 Rsch. Ltd. v. Indian Bros.*, No. 03-19-00078-CV, 2021 WL 417027, at *5 (Tex. App.—Austin Feb. 5, 2021, no pet.) (mem. op.). Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the finding under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not. *Id.* When reviewing factual sufficiency to support a finding, we will set aside the finding only if, after considering and weighing all the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so contrary to the

13

overwhelming weight of all the evidence that the finding should be set aside. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of the credibility of witnesses and the weight to be given to their testimony, and we must not merely substitute our judgment for that of the trier of fact. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (explaining that "trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony").

**Easement by Necessity**

An easement by necessity "results when a grantor, in conveying or retaining a parcel of land, fails to expressly provide for a means of accessing the land." *Hamrick v. Ward*, 446 S.W.3d 377, 382 (Tex. 2014) (citing *Alley v. Carleton*, 29 Tex. 74, 78 (1867)); *see Staley Fam. P'ship v. Stiles*, 483 S.W.3d 545, 548 (Tex. 2016) (stating that when owner conveys part of tract of land and retains landlocked portion, necessity easement over portion conveyed may be implied so owner of landlocked part can access it). For an easement to be a necessity, the claimant must show that he lacks an alternative route to legally access a public roadway from his property. *Staley Fam. P'ship*, 483 S.W.3d at 549. "Whether a property owner is entitled to an easement by necessity is a question of law, although underlying factual issues may need to be resolved in order to reach the legal question." *Id.* at 548. "The party claiming a necessity easement has the burden to prove all facts necessary to establish it." *Id.* (citing *Bains v. Parker*, 182 S.W.2d 397, 399 (Tex. 1944)).

To successfully assert an easement by necessity, a party must establish: "(1) unity of ownership of the alleged dominant and servient estates prior to severance; (2) the claimed

14

access is a necessity and not a mere convenience; and (3) the necessity existed at the time the two estates were severed." *Hamrick*, 446 S.W.3d at 382 (citing *Koonce v. J.E. Brite Est.*, 663 S.W.2d 451, 452 (Tex. 1984)); *see #1 STR, LLC v. White*, No. 03-23-00663-CV, 2024 WL 3056636, at *3 (Tex. App.—Austin June 20, 2024, no pet.) (mem. op.) (stating elements of necessity easement). "The 'necessity' element for an easement by necessity 'means that the use of the easement must be economically or physically necessary for the use of the land and not merely desirable.'" *Pisarski, Inc. v. Hong Bui*, No. 07-17-00118-CV, 2018 WL 4057285, at *2 (Tex. App.—Amarillo Aug. 24, 2018, no pet.) (mem. op.) (quoting *Payne v. Edmonson*, 712 S.W.2d 793, 796 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.)); *see Machala v. Weems*, 56 S.W.3d 748, 755 (Tex. App.—Texarkana 2001, no pet.) (explaining that "if the owner of the land can use another way, he cannot claim by implication a right to pass over that of another to get to his own"). "[A] party seeking a necessity easement must prove both a historical necessity (that the way was necessary at the time of severance) and a continuing, present necessity for the way in question." *Lester v. Conway*, No. 04-15-00730-CV, 2016 WL 7234053, at *2 (Tex. App.—San Antonio Dec. 14, 2016, no pet.) (mem. op.) (quoting *Hamrick*, 446 S.W.3d at 382).

**Was the evidence sufficient to support an easement by necessity?**

Appellants do not challenge the evidence to support that there was unity of ownership of Mattie Turner's land prior to her deeding Joe's Tract in 1914 and that Joe's Tract was landlocked, but in their first three sub-issues of their first issue, they challenge the legal and factual sufficiency of the evidence to support an easement by necessity on the grounds that the evidence was insufficient to establish that the claimed easement was the only legal access to a

15

public road at the time that Mattie Turner deeded Joe's Tract to her son in 1914, the claimed easement has been a continuing necessity since 1914, and that plaintiffs disproved the feasibility of alternative means of access. Appellants challenge the evidence to support that China Creek Road was a public road in 1914 and argue that plaintiffs' evidence was insufficient to establish an easement by necessity because: (i) no living witness had knowledge of events from 1914; (ii) historical documents were missing or incomplete; (iii) plaintiffs failed to prove a continuous necessity from 1914 to present, contending that "there were multi-year gaps in the evidence regarding *any* use of the claimed easement, necessary or not;"[11] (iv) "[a]ny claimed necessity vanished in 1947 due to pooling" of the tracts between Joe Turner and his sisters; and (v) plaintiffs failed to show that alternative access routes are not currently infeasible, contending that "the primary occupier of the property (plaintiffs' 39-year tenant) [Sloan Livestock] routinely accesses [Plaintiffs' Tract] by other means." In these sub-issues, appellants challenge the trial court's Findings of Fact Nos. 3 through 9 and 11 through 13 and its Conclusion of Law No. 5.

Appellants' arguments are based in part on their contentions that there are two alternative ways to access a public road from Plaintiffs' Tract in addition to the Roadway and that it was plaintiffs' burden "to show that they investigated the feasibility of obtaining [alternative] access (such as available easement rights across neighboring property." They rely on the evidence that Sloan Livestock had leased Plaintiffs' Tract for its cattle operations for many years and accessed the tract by crossing over the riverbed of the San Saba River from the property that it owned on the other side of the river. Jeff Sloan also testified that they "occasionally" accessed Plaintiffs' Tract from the land to the west, that the owner of that land

---

[11] Appellants argue that there are evidentiary gaps of continuing necessity from 1914 to 1920 and 1943 to 1949.

16

had allowed access when requested, and that one time access was granted under a "gentlemen's agreement" in exchange for maintaining "a partnership fence between the two properties."[12] Relying on this evidence, appellants argue that these alternatives for accessing Plaintiffs' Tract preclude an easement by necessity. According to appellants, if "there are or were any existing or obtainable alternatives—even undesirable ones, such as routes that could sometimes be *impassable*, or that require passage via *navigable waters*, or that may be very expensive to obtain—then there can be no easement by necessity."

We, however, review the evidence to determine if it was legally and factually sufficient to establish the elements for an easement by necessity as stated by the Texas Supreme Court in *Staley Family Partnership*, 483 S.W.3d at 549, and *Hamrick*, 446 S.W.3d at 382.[13]

---

[12] To the extent that appellants contend that Johnette Early's testimony established a private or public easement from the property to the west to access Plaintiffs' Tract, the trial court, as the trier of fact, was free to find such evidence not credible. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). Johnette Early testified that her father showed her the western route that was an easement belonging to Plaintiffs' Tract and that "there would have been usage from the days when Buffalo Ford was an Indian Crossing and the public went that way and when Rainy's Crossing was a public crossing and the public went that way and the road between those two connected them." She also testified that her father took her "across the low-water bridge, which was Rainy's Crossing where a ferry used to operate," and told her that the Turners had an easement. Her testimony conflicted with other testimony about the location of Buffalo Ford and with Ricky Lambert's testimony, and there was no documentary evidence of an express easement.

[13] Appellants' cited cases to support their contention that the elements of an easement by necessity require a plaintiff to present evidence ruling out the feasibility of obtaining an alternative easement are factually distinct and do not support increasing plaintiffs' burden here to present this type of evidence. *See, e.g.*, *Duff v. Matthews*, 311 S.W.2d 637, 641 (Tex. 1958) (explaining that "[h]aving a road to one part of his tract of land, [the easement claimant] cannot have another way of necessity to another part of this same tract"); *#1 STR, LLC v. White*, No. 03-23-00663-CV, 2024 WL 3056636, at *5 (Tex. App.—Austin June 20, 2024, no pet.) (mem. op.) (reversing easement by necessity in context of appeal from summary judgment when there was evidence that dominant estate had not been accessed by proposed easement on servient estate and that appellee had been accessing dominant estate by alternative routes); *Miller v. Elliott*, 94 S.W.3d 38, 41, 44 (Tex. App.—Tyler 2002, pet. denied) (stating that "[m]erely

17

Based on our review of the evidence, we conclude that it was. In finding that there was an easement by necessity, the trial court could have credited the evidence that supported findings that (i) when Mattie Turner deeded Joe's Tract in 1914 to her son, she continued to own the land to the north and east, and Joe's Tract was accessed by travelling over her remaining land to China Creek Road; and (ii) from 1914 to the time of trial, Joe's Tract was bounded by the San Saba River to the south and by land to the west that was owned by third parties. Although at times plaintiffs or their predecessors in title were given permission to access their property from the west and south, the evidence supported that plaintiffs did not have legal access along those routes. Appellants rely on Sloan Livestock's operation and ownership of the land to the south and use of Plaintiffs' Tract by crossing from their land over the riverbed, but they did not present evidence that would support treating plaintiffs and the company as one in the same.[14] There also was evidence that Sloan Livestock could only access Plaintiffs' Tract when the river conditions

---

showing that it would be expensive to obtain another outlet is not generally sufficient to establish necessity" but describing dispute to be whether property owner could access road by using driveway that was subsequently built on neighboring property and concluding in context of summary judgment that "there was no evidence that the alleged easement was reasonably necessary to the use and enjoyment of the dominant estate, both at the time of severance and continuing as of the date [appellants] filed their response"); *Trujillo Enters., Ltd. v. Davies*, 573 S.W.3d 297, 305-08 (Tex. App.—El Paso 2019, no pet.) (addressing duty to investigate alternatives for access through owner's own property when owner's land bordered on three different streets). Appellants also concede that they "have seen no Texas case faulting plaintiffs for not showing the infeasibility of obtaining an easement."

[14] Other evidence supported that the San Saba River is navigable and, thus, owned by the State of Texas. *See* Tex. Nat. Res. Code § 21.001 (defining "[n]avigable stream"); Tex. Parks & Wild. Code § 1.011(c) (stating that beds of public rivers are property of state). Assuming the river is owned by the State of Texas further supports that Plaintiffs' Tract did not have legal access to a public road from the south.

were right, and that when the river conditions were not right, the only way they were able to care for their cattle on Plaintiffs' Tract was by accessing it from appellants' tracts of land.

Appellants also argue that plaintiffs were required but failed to present sufficient evidence of a) the continuous necessity of the claimed easement for every year after 1914 or from a witness who was alive in 1914 and b) "the circumstances [in 1914] as it pertained to any use of their claimed easement path." The elements as stated by the Texas Supreme Court, however, do not require proof of a specific "claimed easement path" across the servient estate but that access across the servient estate is a necessity and not a mere convenience.[15] *See Hamrick*, 446 S.W.3d at 382. Further, plaintiffs presented evidence that the trial court could have found credible to reasonably infer that access through appellants' properties to Plaintiffs' Tract continued as a necessity, not a mere convenience, from 1914. *See id.*; *Akers v. Stevenson*, 54 S.W.3d 880, 885-86 (Tex. App.—Beaumont 2001, pet. denied) (granting necessity easement based in part on testimony about ancestor's acquisition of tract and historical use of roadway in question); *see also* Tex. R. Evid. 803(19), (20).[16] As detailed above, multiple witnesses testified

---

[15] To the extent that appellants' position is that evidence of a specific "claimed easement path" across the servient estate is required to create an easement of necessity, their position would conflict with the rules for determining the location of an easement by necessity after its creation: "The right to select the location of the easement belongs initially to the owner of the servient estate at the time the dominant estate is created, which right is to be exercised in a reasonable manner, having due regard for the rights and interests of the dominant estate owner." *See #1 STR, LLC*, 2024 WL 3056636, at *3 (quoting *Lester v. Conway*, No. 04-15-00730-CV, 2016 WL 7234053, at *5 (Tex. App.—San Antonio Dec. 14, 2016, no pet.) (mem. op.)). "If the servient owner fails to do so, then the owner of the dominant estate may locate the easement of necessity with due regard for the convenience of the parties." *Id.* (quoting *Lester*, 2016 WL 7234053, at *5).

[16] Appellants' cited authorities do not require a plaintiff to present a particular type of evidence to prove the necessity of an easement at the time of severance or for each year from the time of severance. *See, e.g.*, *Fort Worth & W. R.R. v. Albert*, No. 10-18-00219-CV, 2022 WL 554108, at *4 (Tex. App.—Waco Feb. 23, 2022) (mem. op.) (concluding that evidence was

19

about and other evidence showed the historical use of appellants' tracts of land to access Plaintiffs' Tract from China Creek Road without any complaint from before 1914 forward, including using the Roadway to convey crops, cattle, and farming equipment.[17]

---

insufficient to support easement by necessity when no party testified about "how any part of the property was used in 1887, if at all, by the original owner and if there was ever a necessity to cross from the north side to the south side across the railroad's property in 1887 when the property was originally severed"), *aff'd in part & rev'd in part*, 690 S.W.3d 92 (Tex. 2024) (concluding in part that evidence was legally insufficient to support easement-by-necessity finding but reversing in part because legally sufficient evidence supported prescriptive-easement finding); *Sekula Farms, Inc. v. Giesick*, No. 04-04-00869-CV, 2005 WL 3115760, at *3 (Tex. App.—San Antonio Nov. 23, 2005, no pet.) (mem. op.) (concluding in context of summary judgment that evidence did not conclusively establish historical necessity when witnesses did not have personal knowledge of circumstances as they existed at time of severance); *Wilson v. McGuffin*, 749 S.W.2d 606, 609 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied) (reversing injunction that precluded closing of road that appellee sought to use as easement by necessity to access property when there was no evidence that "necessity existed for the road in question, or that the road even existed" at time of severance in 1901); *see also Daniel v. Fox*, 917 S.W.2d 106, 111 (Tex. App.—San Antonio 1996, writ denied) (explaining that "the rule requiring a showing that the use be apparent, permanent and continuous does not apply to a way of necessity").

[17] For example, James Cameron testified that he remembered a time when they were driving cattle from Joe's Tract to "the Turner house where the pens were" and John "came driving up" and waited until they "ran the cows across the road." John McConnell was the son of Floss McConnell, and the father of Johnette Early. The evidence showed that the Turner house was near the entrance to the Roadway from China Creek Road.

The evidence also included the "San Saba County History 1856-1983," which was published by the San Saba Historical Commission in 1983. This exhibit recounts the married histories of Rufus Cobb and Martha (Mattie) Turner and Joe Turner and his wife. According to the history, Rufus Cobb and Mattie Turner married in 1883 and "moved to San Saba, Texas in 1890 to settle on some of the land granted to Mrs. Turner's uncles who had come to the Mexican province of Texas in 1833." Rufus Turner "was engaged in farming and ranching all his life." As to the houses on their land, their first house was on the river, but after the river overflowed, they built a house "where is still stands on the China Creek Road about 5 miles from San Saba." As to the married history of Joe Turner and his wife, they were married in June 1918 and lived "in the ranch house that had been built by Rufus Turner" in the China Creek Community. Joe Turner "ranched, farmed, and raised some pecans on China Creek. His small farm on the San Saba River was one of the first in San Saba County to be successfully irrigated." During the late

As to appellants' argument that the evidence was insufficient to establish that County Road 202 or China Creek Road existed as a public road in 1914, appellants do not dispute that the Roadway connects with County Road 202, that County Road 202 is a public road, or that County Road 202 has been called China Creek Road. They argue that to prove a public road in 1914, plaintiffs were required to present evidence that showed "notice to landowners whose property was taken, compensation being paid to them, and an order opening the road to the public" and that plaintiffs failed to do so.[18]

Plaintiffs' evidence included the 1923 deed transferring the tract of land from Mattie Turner to Floss McConnell that refers to "China Creek public road" when describing the tract's boundaries, county commissioners' court minutes from the late 1800s addressing the Brownwood Road No. 2 as a public road,[19] the 1940 will of Rufus Turner that references

_____

1920s, "the cotton grown on the Turner farm was picked by hand and hauled to San Saba in horse-drawn wagons."

Moving forward in time, the express easement in the 1984 deed that authorized access from Plaintiffs' Tract across the tract that was part of Joe's Tract but now owned by Johnette Early supports the continued necessity of an easement across appellants' tracts.

[18] According to appellants, the record before the trial court only established that China Creek Road became a public road in 2008.

[19] Appellants contend that there is missing information in the minutes, but the trial court could have credited the minutes that were admitted along with the other evidence concerning the road to find that it was a public road. Minutes from the commissioners' court from the 1870s stated that it was "satisfied that the road law has been complied with in every particular" as to the Brownwood Road No. 2 and ordered that "said Road be and is hereby established and classed as a public road of the second class." The minutes also described the route of the road consistent with China Creek Road's current location. Minutes from the commissioners' court in the 1890s also reflect that $2,000 of public funds was appropriated to build a bridge over the San Saba River "at Beverage Crossing Brownwood Road No. 2" and that in 1900, the commissioners' court ordered the bridge to be repaired with public funds. A photo that was admitted into

21

Brownwood Road No. 2 in relation to the family's property, and topographical maps from 1885 and 1955 that show lines along the same path as County Road 202. James Cameron also testified to the various names of the road at issue including China Creek Road, County Road 202, Brownwood Road No. 2, and Brownwood Road by Beveridge Crossing, and that China Creek Road crossed the Beveridge Bridge. Jerry Blankenship testified about plotting latitude and longitude coordinates as they presently exist on County Road 202 that were also located on the lines on the topographical map from 1885. Based on our review of the record including the evidence detailed above, we conclude that it was sufficient to support the trial court's findings that Brownwood Road No. 2, Brownwood Road via Beverage Crossing, China Creek Road, and County Road 202 all refer to the same road and that the road existed as a public road from before 1914 to the present.

**The Impact of the Siblings' Agreement in 1947**

In their second issue, Appellants argue that the evidence conclusively established that "a merger of estates in 1947 eliminated any claim of a pre-existing easement by necessity and that any statute of frauds defense was waived (or otherwise inapplicable due to estoppel or other pleaded defenses)." Appellants argue that by agreeing to "pool" their tracts, Joe Turner and his sisters were "co-owners of the entirety of the combined acreage for some period of time." Appellants rely on their requested findings of fact and conclusions of law that the trial court did

---

evidence of a historical marker on China Creek Road also marks the location of Beverage Bridge and details its construction in 1886.

not issue and the testimony about Joe Turner's agreement with his sisters after their father died to redivide their land in 1947.[20]

The evidence, however, does not support that the tracts of land at issue were legally merged into a single tract of land in 1947.[21] The 1947 deeds reflect that Joe's Tract was treated separately from the other tracts, and the evidence was that he owned the tract of land both before and after the 1947 deeds.[22] And although Joe's Tract increased in size by some acres at that time, it remained landlocked and continued to require access over appellants' tracts to a public road. *See Albert v. Fort Worth & W. R.R. Co.*, 690 S.W.3d 92, 97 (Tex. 2024) (explaining that easement entitling adjacent landowner to cross over adjoining land is easement appurtenant to land and that easement attaches to land itself and conveys with dominant estate (citing *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 203 (Tex. 1962))).

[20] Appellants' requested findings of fact and conclusions of law in substance included that: (i) Joe Turner and his siblings made an oral family settlement agreement regarding their respective tracts and Mattie Turner's remaining property; (ii) Joe Turner was asked to put his tract back in the "pot"; (iii) the siblings agreed to "pool" the separate tracts and divide the land again, which they carried out through 1947 deeds; (iv) according to the terms of the family settlement, the siblings agreed that they would equally own the tracts of land previously conveyed to them "as a single, commonly owned tract"; (v) this agreement and subsequent performance precluded any easement by necessity claim based on the 1914 deed; and (vi) the oral aspect of the agreement between the siblings was enforceable because of subsequent performance, estoppel, and ratification.

[21] The exhibits included appellants' responses to interrogatories. In those responses, appellants state that there "was no unity of title in 1947" as to the tracts at issue here and that there was "no written evidence that the parties in 1947 transaction ever executed conveyances to each other to effectuate 'pooling' before executing subsequent deeds." Mattie Turner died in May 1934 without a will, and she owned tracts of land in addition to the ones at issue in this case that passed to her three children in equal shares subject to Rufus Turner's life estate.

[22] As appellants recognize in their reply brief, there was no deed contributing Joe's Tract to a "pool." The trial court also could have credited James Cameron's testimony that he did not believe that the siblings "ever conveyed things such that they all ended up with undivided interests."

Based on our review of the record and for the reasons stated above, we conclude that the evidence was legally and factually sufficient to support the trial court's declaration of an easement by necessity. Thus, we overrule appellants' first three sub-issues of their first issue and their second issue.[23]

**Attorney's Fees**

In their fifth sub-issue to their first issue, appellants challenge the award of attorney's fees to plaintiffs. The trial court awarded $69,424.11 for fees incurred through the trial court level, $80,000 if the case was appealed to the Court of Appeals, $30,000 if a petition for review was filed in the Texas Supreme Court, $40,000 if briefing on the merits was requested by the Texas Supreme Court, and $15,000 if oral argument was held in the Texas Supreme Court.

The Uniform Declaratory Judgments Act (UDJA) authorizes a court to award "reasonable and necessary attorney's fees as are equitable and just" in "any proceeding under" the Act. Tex. Civ. Prac. & Rem. Code § 37.009. "The court is not required to award attorneys' fees but may, within its discretion, award them 'to the prevailing or non-prevailing party or decline to award attorney's fees to either party, regardless of which party sought the declaratory relief.'" *Sakonchick v. Overlook at Rob Roy Owner, LLC*, No. 03-23-00085-CV, 2025 WL 626590, at *14 (Tex. App.—Austin Feb. 27, 2025, pet. denied) (mem. op.) (quoting *HMT Tank Serv. LLC v. American Tank & Vessel, Inc.*, 565 S.W.3d 799, 813 (Tex. App.—Houston [14th Dist.] 2018, no pet.)).

---

[23] Because we have concluded that the evidence was legally and factually sufficient to support an easement by necessity, we do not address appellants' fourth sub-issue that challenges the sufficiency of the evidence to support an easement by estoppel. *See* Tex. R. App. P. 47.1.

We review a trial court's award of attorneys' fees under the UDJA for abuse of discretion. *Allstate Ins. v. Irwin*, 627 S.W.3d 263, 270-71 (Tex. 2021). "A court abuses its discretion when there is 'insufficient evidence that the fees were reasonable and necessary, or when the award is inequitable or unjust.'" *Sakonchick*, 2025 WL 626590, at \*14 (quoting *Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 891 (Tex. App.—Austin 2010, pet. denied)). "Whether attorneys' fees are reasonable and necessary are questions of fact; whether the fees are equitable and just are questions of law." *Id.* (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *Bailey v. Smith*, 581 S.W.3d 374, 395 (Tex. App.—Austin 2019, pet. denied)).

Appellants' challenge to the amount of attorney's fees awarded through the trial level is contingent on this Court reversing the declaratory judgment in favor of plaintiffs. Because we are affirming the trial court's judgment declaring an easement by necessity, we overrule this sub-issue to the extent that it challenges the awarded fees through the trial court level. We, however, must sustain this sub-issue to the extent that it challenges the amount of appellate attorney's fees awarded because we conclude that the evidence was insufficient to support the amount awarded.

Both sides presented evidence about estimated appellate attorney's fees, and the trial court awarded plaintiffs the amount of appellate attorney's fees that appellants were requesting. The lawyer for appellants testified that the hourly rate for their proposed appellate attorney was typically $375, which was "fairly low" for "other appellate attorneys of his caliber"; opined that appellate attorney's fees in the total amount of $165,000 would be reasonable and necessary; and testified about the estimated lump-sum amount for each of the stages of an appeal, which amounts the trial court awarded to plaintiffs. The lawyer for plaintiffs

25

also testified about the estimated lump-sum amount for each of the stages of an appeal, but he opined that appellate attorney's fees in the total amount of $65,000 would be reasonable and necessary. He testified that the amounts of "$25,000 or more" for an appeal to the Court of Appeals, $10,000 if a petition for review is filed with the Texas Supreme Court, $15,000 if briefing on the merits was requested by the Texas Supreme Court, and $15,000 if oral argument was held in the Texas Supreme Court would be reasonable and necessary.

A party seeking to recover contingent appellate fees must "provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020); *see id.* (addressing standard for contingent appellate attorney's fees, "which have not yet been incurred and thus must be projected based on expert opinion testimony"); *Mustafa v. Asim*, No. 03-23-00018-CV, 2024 WL 5241054, at *12-13 (Tex. App.—Austin Dec. 20, 2024, no pet.) (mem. op.) (following *Yowell* to reverse and remand award of appellate attorney's fees). Here, there was testimony about the lump sum amount for the different stages of the appeal process and a possible hourly rate for appellants' proposed appellate lawyer, but this Court has concluded that this type of evidence is not sufficient. *See Mustafa*, 2024 WL 5241054, at *12-13 (explaining that both this Court and sister courts "have reversed awards of attorney's fees that were based on this same type of attorney testimony that states the estimated amounts for handling each phase of an appeal without identifying the services the attorney reasonably believes will be necessary").

Bound by our precedent and having reviewed the record, we conclude that the evidence was insufficient to support the amount of appellate attorney's fees awarded. Further we conclude that the trial court erred when it did not make the award of appellate attorney's fees

conditioned on success on appeal. *See In re K.A.R.*, 171 S.W.3d 705, 711-12 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (requiring award of appellate attorney's fees to be conditioned on success of appeal). Thus, we sustain appellants' fifth sub-issue to the extent that it challenges the appellate attorney's fees awarded.

## CONCLUSION

For these reasons, we reverse the award of appellate attorney's fees and remand the issue to the trial court for redetermination of those appellate fees. Having overruled Appellants' other dispositive issues, we affirm the remainder of the trial court's declaratory judgment.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed in Part; Reversed and Remanded in Part

Filed: July 10, 2026